IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FREDERICK J. GREDE, as Liquidation Trustee of the Sentinel Liquidation Trust, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 08CV6587 |
| STEPHEN M. FOLAN, | ) ) | Judge James B. Zagel |
| JACQUES DE SAINT PHALLE, and FTN FINANCIAL SECURITIES CORPORATION, | ) ) ) | [Redacted] |
| Defendants. | ) ) ) | |

### DEFENDANTS' STATUS REPORT ON PHASE I DISCOVERY

Since the last status conference on March 24, 2010, Defendants have focused their discovery efforts on: (1) determining the extent to which Charles Mosley's acceptance of entertainment and other alleged "bribes" from brokers was no secret and was apparent to Sentinel management, and thus not bribery;[1] and (2) estimating the cost of discovery for the remaining issues in the case so that the Court may weigh the burden on Defendants of proceeding immediately to that stage before the first stage of discovery concerning commercial bribery ("Phase I") is complete, as the Trustee has requested.[2] This Status Report addresses those subjects and proposes a schedule for completing Phase I and briefing motions for partial summary judgment on the Trustee's commercial bribery theory by October 22, 2010, after which the parties would move forward with discovery on other issues.

---

[1] Ex. A, Mar. 24, 2010 Hrg. Tr. at 14:13-19 (THE COURT: "I'd like to see what kind of progress is made on ratification issues, I'd like to see, at least to some extent, what it is that defendants have to support ratification, or know at least some of it….").

[2] *See id.* at 14:4-8; 14:20 - 15:1 (THE COURT: "Then … [the Trustee is] going to serve whatever document discovery you want on them, which will put opposing counsel in a better position to estimate what the costs would be.…. I'm accommodating your concern about proceeding with discovery and the defendants' concern about undue costs by giving him the chance to understand precisely what it is you want, to deal with the issues of costs, and if I get to the point where I say go ahead, we've shorten[ed] the preliminaries that always proceed this.").

I.      **DEFENDANTS' PROGRESS ON DISCOVERY OF SENTINEL**
        **MANAGEMENT'S AWARENESS OF THE ALLEGED BRIBES**

Since the March 24 status conference, Defendants have made substantial progress in completing discovery that shows Mr. Mosley made no attempt to conceal the entertainment provided by Sentinel's brokers, including that provided by Defendants, and that Sentinel management permitted or accepted Mr. Mosley's acceptance of such entertainment and thereby authorized or ratified his conduct.  To date, Defendants:  (1) have deposed four former Sentinel employees with personal knowledge of Sentinel management's involvement in, or knowledge of, entertainment provided to Mr. Mosley and other Sentinel personnel; (2) have deposed three third-party brokers with personal knowledge of entertainment involving Sentinel management; and (3) are in the process of obtaining declarations from the former Sentinel officers and directors who have taken the position that they will assert their right not to testify under the Fifth Amendment.

The following is a representative sampling of the evidence that Defendants have obtained that establishes the lack of secrecy with respect to the entertainment at issue and Sentinel management's acceptance of that entertainment:

1.      **There was no concealment of broker entertainment at Sentinel.**



    **Mosley's Invitations re: Broker Entertainment.**

    **Jeffery J. Logan, Sentinel Assistant Trader:**

    (Ex. B, Logan Tr. at 61:14-20.)

    **Crystal M. York, Sentinel Assistant Trader:**

    (Ex. C, York Tr. at 67:24 - 68:1.)

    **Chyil Schmookler, Eric Bloom's Executive Assistant:**

    (Ex. D, Schmookler Tr. at

80:4-8, 13-17.)

**Cynthia Madrigal, Sentinel Assistant Trader:** ███████████████

███████████████████████████████ (Ex. E, Madrigal Tr. at 78:17-22.)

This testimony is corroborated by numerous invitations that Mr. Mosley extended to Mr.

Bloom and other Sentinel personnel via email.

**Open Discussion of Broker Entertainment in Sentinel's Offices.** ██████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

**Logan:** ██████████████████████████████ (Ex. B,
Logan Tr. at 119:16.)

████████████████████████████████████ (*Id.* at 86:5 - 87:24; 78:1-15.)

███████████████████████████████████████ (*Id.* at 104:6 - 105:4;
120:12-15; 151:24 - 152:6.)

████████████████████████ (*Id.* at 16:13-18.)

**Schmookler:** ██████████████████████████

██████████████████████ (Ex. D, Schmookler Tr.
at 103:6-24.)

█████████████████ (*Id.* at 94:11-19.)

**Madrigal:** ████████████████████████

███████████████████ (Ex. E, Madrigal Tr. at 93:18 - 94:3.)

**Electronic Notices re: Mosley Entertainment and Broker Invitations to Eric Bloom.**

Mr. Mosley also frequently sent email notices to Sentinel's entire office (including to Eric

Bloom and other members of Sentinel management) when he went out with brokers for golf,

lunch, and other entertainment events during business hours.[3] There is no evidence that brokers

sought to keep entertainment secret from Mr. Bloom. On the contrary, brokers who sought to

entertain Mr. Mosley also frequently extended invitations to Mr. Bloom, as well. (Ex. F, Folan

Tr. at 307:19-21; ████████████████████████████████████████

---

[3] *See, e.g.*, Ex. I (sample notices); Ex. B, Logan Tr. at 96:15 - 97:4 ██████████████

███████████████████████████████████████████████

████████████████████████████.

2.    **Sentinel's management team accepted substantial broker entertainment themselves and made no attempt to prohibit, limit, or discourage Mr. Mosley's acceptance of such entertainment.**

      **Sentinel had no policies limiting broker entertainment.** ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ (*See* Ex. B, Logan Tr. at 89:20 -

90:8; Ex. D, Schmookler Tr. at 164:1-11; Ex. E, Madrigal Tr. at 51:17-24, 59:5-15.[4])  Sentinel's

official Compliance Manuals confirm that Sentinel had no such restrictions.[5]

      **Mr. Mosley had carte blanche authority to accept gifts and entertainment.** ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

      **Eric Bloom and other Sentinel executives often accepted broker entertainment.**

Former Sentinel employees and third-party brokers testified that Sentinel's management team,

including Eric Bloom, often accepted entertainment from brokers, including high-end meals,

expensive wines and liquors, hotel accommodations, concerts, and premium sports tickets.

████████████████████████████████████████████████████████████████

---

[4] ████████████████████████████████████████████████████████

████████████████████████ (*See* Ex. B, Logan Tr. at 105:6-10; Ex. C, York Tr. at 61:14-17.)

███████████████████████████████████████████████████████████████

████████████████ (*See* Ex. E, Madrigal Tr. at 131:5 - 132:5.)

[5]    Sentinel's Compliance Manuals for 2005-2007 contained an enormous loophole that
effectively eliminated any restrictions on broker entertainment.  The Compliance Manuals
characterized entertainment provided by financial institutions as "other economic benefits."  As
Sentinel's Chief Investment Officer, Charles Mosley was in charge of approving or rejecting
Sentinel's acceptance of such benefits, but his approval was only necessary if the financial
institution provided the benefit "because [Sentinel] renders investment management services to
clients that, in the aggregate, maintain a certain level of asserts at that financial institution."  *See,
e.g.*, Ex. J, TRUSTEE-160-00016027-28; TRUSTEE-160-00016068-69 (excerpts from Sentinel
2007 Compliance Manual).  Given that brokerage firms that merely traded securities with
Sentinel did not maintain any of Sentinel's client assets (which were maintained at The Bank of
New York), there were no written restrictions on the entertainment at issue in this lawsuit.

[6]    *See* Ex. B, Logan Tr. at 27:13-18.

██████████████████████████████████████████████████
██████████████████████████████████████
(Ex. D, Schmookler Tr. at 69:24 - 70:8.) ████████████████████
████████████████████████████████████
████████████████ (*See, e.g.*, Ex. B, Logan Tr. at 123:22 - 126:17; Ex. C, York Tr. at 68:19 -
69:23.)

**Brokers picked up the tab**████████████████████████████████
████████████████████████████ (*See* Ex. B, Logan Tr. at 109:2-6, 165:16-19, 174:7-
10, 186:10-15; Ex. D, Schmookler Tr. at 68:16-24; Ex. C, York Tr. at 67:5-14, 63:3-16;
Ex. E, Madrigal Tr. at 70:24 - 71:4, 104:22 - 105:3, 153:14-19.)  At times, Sentinel
management would even allow Sentinel employees to recruit a "sponsor" or "lucky
broker" from among Sentinel's brokers to pay for nights out or baseball games.  *See* Ex.
K (internal Sentinel emails).

**Eric Bloom's Parties in Memphis with Brokers.**  For several years in a row, Eric
Bloom and his friends went to Memphis for a broker-subsidized weekend of partying
during Memphis's annual "Barbeque Fest."  In 2006, for example, Mr. Bloom allowed a
broker to cover the cost of rooms at the Peabody, one of Memphis's finest hotels, for
three nights for himself, his fiancée, Mr. Mosley, and his wife.  Mr. Bloom allowed the
same broker to pay for drinks at various locations and a $1,600 dinner for Mr. Bloom and
his friends.  Entertaining Mr. Bloom, his friends, and Mr. Mosley for that single weekend
cost the broker and his firm more than $5,000.  (*See* Ex. L, Weatherford Tr. at 291:5 -
292:13, 298:24 - 300:11; Ex. M (H. Weatherford expense report for Barbeque Fest 2006;
correspondence among H. Weatherford, E. Bloom, and others regarding hotel rooms).)
That same weekend, Mr. Bloom asked another Memphis broker to provide him, his
fiancée, Mr. Mosley, and Mr. Mosley's wife wristbands allowing them admission to the
festival and free food and drinks.  (*See* Ex. N (correspondence among R. Jones, C.
Mosley, and E. Bloom).)

**Eric Bloom's Knowledge of Outings to Gentlemen's Clubs.**  On the last night of
Barbeque Fest in 2006, Eric Bloom and his fiancée accompanied two Memphis brokers,
Mr. Mosley, and two personal friends of Mr. Bloom's to the very same Memphis
gentlemen's club where Mr. Mosley had been with Mr. Folan and Mr. de St. Phalle
earlier that week.  (*See* Ex. L, Weatherford Tr. at 105:13 - 109:20, 294:4 - 298:18; ████
████████████████.)  After staying for a short time, Mr. Bloom and his fiancée left
Mr. Mosley, Mr. Bloom's two friends, and the two brokers to party at the gentlemen's
club until at least 4 a.m.  (*See* Ex. L, Weatherford Tr. at 106:20 - 107:1, 294:4 - 296:16.)
████████████████████████████████████████████████ (Ex. B,
Logan Tr. at 192:18 - 194:15.)  Lastly, Mr. Bloom received an invitation to Mr. Logan's
bachelor party in 2005 in which Mr. Mosley described the agenda as "golf and girls," and
which Mr. Bloom subsequently referred to as a "trainwreck." (Ex O.)  It is apparent that
Mr. Bloom had no objections to Sentinel personnel going to gentlemen's clubs with
brokers.

**Eric Bloom's Acceptance of Alaskan Fishing Trip from Broker.**  In 2005, Eric Bloom

accepted an invitation from one of his Memphis broker friends to an exclusive lodge in Elfin Cove, Alaska for a long weekend of broker-sponsored fishing.  The brokerage firm covered all expenses for its guests except airfare.  Mr. Bloom pulled out of the trip at the last minute for medical reasons, but told the broker that he would be "ready for the next one."  (*See* Ex. L, Weatherford Tr. at 274:17 - 275:12; Ex. P.)

**3.     Eric Bloom was well aware of the close personal friendship between Mr. Folan and Mr. Mosley, as well as the frequency of entertainment by Mr. Folan and others, and was himself good personal friends with brokers who entertained Sentinel personnel.**

**Friendship Between Mr. Folan and Mr. Mosley.**  Eric Bloom was well aware of Mr. Mosley's close personal friendship with Mr. Folan and other brokers from various firms, and was also familiar with the frequency with which Mr. Mosley and Mr. Folan socialized.  One broker with whom Mr. Bloom was close friends testified that he and Mr. Bloom specifically discussed how Mr. Folan and Mr. Mosley were "inseparable" and "with each other all the time."  (Ex. L, Weatherford Tr. at 138:21-23.)

**Mr. Bloom's Knowledge of Mr. Mosley's Nights Out with Broker Friends.**



(Ex. B, Logan Tr. at 119:19 - 120:1.)

(*Id.* at 153:1-6 (Logan:

**Logan:**

(Ex. B, Logan Tr. at 153:16-23.)

**Schmookler:**

(Ex. D, Schmookler Tr. at 90:23-24; 91:14-21; 92:12-15.)

**Riley Jones of Cantor Fitzgerald:**

(Ex. H, Jones Tr. at 79:12 - 80:19.)

(*Id.* at 79:4-10.)

**Mr. Bloom's Friendships and Personal Trips with Brokers.**  ███████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████  (*See* Ex. D, Schmookler Tr.

at 106:24 – 108:6; Ex. B, Logan Tr. at 179:22 – 182:3; Ex. C, York Tr. at 122:17 – 123:17; Ex.

E, Madrigal Tr. at 192:14 – 193:4).)  He also invited Mr. Folan and other brokers to his gala 40th

birthday party, bachelor party, and wedding.  (*See* Ex. F, Folan Tr. at 314:3-5; Ex. L,

Weatherford Tr. at 55:8-19, 58:17-21; ████████████████████████████████)

**Mr. Bloom's Receipt of Mr. Mosley's Emails.**  In January 2007, Eric Bloom began

being automatically copied on all Bloomberg emails sent to Mr. Mosley.  He thus received all of

Mr. Mosley's numerous incoming messages concerning entertainment and social outings with

brokers.[7]  Even before January 2007, all of Mr. Mosley's Bloomberg emails were automatically

forwarded to the other employees at the Sentinel trading desk, including Mr. Logan, Ms. York

and Ms. Madrigal.[8]

\*\*\*\*

In light of the above, the Trustee's entire commercial bribery theory appears to be

susceptible to summary judgment.  Bribery is a species of fraud characterized by payments or

other valuable consideration to an agent that are kept secret from his or her principal.[9]  Where

the alleged bribe is not kept secret from the employer, it is, by definition, not a bribe.  *See, e.g.,*

*Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 573-74 (7th Cir. 2004) (If the plaintiff

"knew all along about [its employees'] bribe-taking …. this would exonerate the defendants, all

right, because it would mean there had been no fraud in the first place."); *Mantek*, 780 F.2d at

705 n.3 (noting that "the essence of commercial bribery is that the seller is secretly giving a bribe

to the customer's agent to induce the agent to betray his principal (the customer) by purchasing

the seller's product even though it is not in the customer's best interest").  Here, Mr. Mosley's

acceptance of entertainment from Defendants was not in any way concealed or kept secret from

---

[7]  *See, e.g.*, Ex. Q (sample emails).

[8]  *See* █████████████████████; Ex. R (trading desk emails).

[9]  *See, e.g., Mantek Div. of NCH Corp. v. Share Corp.*, 780 F.2d 702, 707 (7th Cir. 1986)
(recognizing that "[t]his circuit has long followed the generally accepted Federal Trade
Commission view of commercial bribery as the practice of sellers of <u>secretly</u> paying money or
making gifts to employees or agents to induce them to promote purchases by their own
employers from the sellers offering the secret inducements") (internal quotation marks and
citation omitted; emphasis added).

anyone at Sentinel, including Eric Bloom and other members of Sentinel management.  That fact alone is fatal to Plaintiff's bribery theory.

The evidence also shows that Sentinel management authorized Mr. Mosley's acceptance of the entertainment at issue by giving him "carte blanche" authority to manage relationships with brokers and accept entertainment from them.  *See Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 625 (7th Cir. 2000) (concluding that Eastern authorized its partner's speculative trading by giving "him carte blanche, not only in the terms of the customer agreement with Refco but also in their refusal to … monitor or supervise [him] ….  The partners were happy when things were going well, and they cannot, by a retroactive cancellation of his authority, shift the cost when things went badly to Refco ….").  Alternatively, Sentinel's management team ratified Mr. Mosley's acceptance of the entertainment after the fact by virtue of their general knowledge of his practices and their failure to take any action to stop those practices.  *See, e.g.*, *In re Bennett Funding Group*, 336 F.3d 94, 100-01 (2d Cir. 2003); *Eastern Trading*, 229 F.3d at 625 (holding that "[i]f [Eastern's] partners did not originally authorize [their partner's] speculati[ve trading], they either ratified them by failing to repudiate them upon discovery of them, or misled Refco into thinking they had ratified them.") (internal citations omitted); *see also Horwitz v. Holabird & Root*, 816 N.E.2d 272, 280 (Ill. 2004) ("ratification of an unauthorized act is tantamount to an original authorization").

## II.    PROPOSED SCHEDULE

Defendants respectfully propose the following schedule for the completion of Phase I and summary judgment briefing on Plaintiff's commercial bribery theory:

| | | |
|---|---|---|
| 1. | **Completion of Phase I discovery:** | August 8, 2010 |
| 2. | **Motion for Partial Summary Judgment due:** | September 10, 2010 |
| 3. | **Opposition to Motion for Summary Judgment due:** | October 8, 2010 |
| 4. | **Reply Brief on Motion for Summary Judgment due:** | October 22, 2010 |
| 5. | **Commencement of Discovery on Remaining Issues:** | October 25, 2010 |

Defendants believe that this schedule will give Plaintiffs and Defendants sufficient time to take several additional depositions that are contemplated by the parties and produce any additional

documents that are relevant to Phase I.[10]

Defendants respectfully submit that the approach outlined above is likely to streamline the resolution of the case by substantially narrowing the issues to be resolved and clarifying the scope of the discovery that remains.  If the bribery theory is eliminated on summary judgment, the *in pari delicto* doctrine would presumably apply to Plaintiff's federal securities fraud claims and all (or nearly all) of the pending state law claims.[11]  That would allow the parties to focus their efforts on the relatively discrete issues surrounding the remaining claims for fraudulent transfer under §§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code (Count 12) and possibly for violations of the Illinois Blue Sky Law, 815 I.L.C.S. § 5/12 (Counts 4 and 5), if those claims are not eliminated on *in pari delicto* grounds.[12]

## III.   COST ESTIMATE FOR FULL MERITS DISCOVERY

As the Court instructed on March 24, Defendants have prepared an estimate of the cost of responding to the remainder of Plaintiff's broad document requests based upon the version of those requests served by the Trustee on April 13, 2009.  By letters to Plaintiff's counsel dated May 28, 2010 and June 3, 2010, Defendants described the potential scope of their document production in the next stage of discovery, taking into consideration their objections to Plaintiff's requests.  Using that framework, Defendants prepared estimates of the cost of producing responsive: (1) hard copy and non-email electronic documents; and (2) emails and their

---

[10]   Defendants have recently produced a small number of newly discovered documents regarding the Phase I entertainment issues.  The parties are also discussing a mutual exchange of documents concerning FTN's accounting guidance for PreTSL income notes and Mr. Mosley's bonus in connection with Plaintiff's theory that the accounting guidance constituted a bribe.

[11]   At the Rule 12(b)(6) stage, the Court did not decide whether the *in pari delicto* doctrine applies, noting that Plaintiff's commercial bribery theory was not subject to that defense.  *See* Order Denying Defendants' Motion to Dismiss, at 1 (Dkt. #65).  In the action against The Bank of New York, however, the Court has already dismissed several claims under the *in pari delicto* doctrine.  *See Grede v. Bank of New York*, No. 08 C 2582, 2009 WL 188460, at *9 (N.D. Ill. Jan. 27, 2009).  In *Grede v. McGladrey & Pullen*, moreover, the Court considered *in pari delicto* to be a "threshold," likely dispositive issue and concluded that the only question remaining was whether the "adverse interest exception" applies.  *Grede v. McGladrey & Pullen LLP*, 421 B.R. 879, 885, 888-889, 890  (N.D. Ill. 2009).

[12]   If New York law controls Plaintiff's state law causes of action, as Defendants respectfully submit it should, then the Illinois Blue Sky law claims would fail for that reason, as well.  *See* Defs.' Response to Sur-Reply, *Grede v. Folan*, 08 CV 06587, Dkt. No. 64 at 2-7 (Apr. 17, 2009).

attachments.  Based on the information currently available, Defendants estimate that it would cost between **$2.6 million** and **$3.3 million** to respond to the remainder of Plaintiff's document requests at this time.  The ultimate cost could be substantially higher or lower depending upon factors such as whether significant claims or issues are eliminated from the case, whether Defendants' objections to producing certain categories of documents are sustained, whether Plaintiff seeks documents beyond those identified in his requests, and the selection of search terms/custodians used for searching email and other electronic documents.  Defendants are currently exploring possible ways to reduce these costs.[13]

   **Hard Copy and Non-Email Electronic Documents.**  With respect to hard copy and non-email electronic documents, Defendants estimate the total cost of production would be between approximately **$110,000** and **$775,000**.  This estimate is based upon:  (1) discussions with document custodians at FTN regarding the location of potentially responsive documents; (2) available inventories of hard copy documents from departments at FTN that potentially have responsive documents; (3) a review of the locations on FTN's network drive that are likely to contain responsive documents; (4) estimates of the volume of documents that will need to be reviewed; (5) estimates of the third-party vendor costs associated with scanning and loading materials into an electronic discovery database for review; (6) estimates of the approximate number of attorney hours necessary to review documents;  (7) estimates of the percentage of privileged documents and the time required to prepare privilege logs; (8) estimates of the work required to identify and make available certain categories of documents for Plaintiff to inspect in FTN's offices; and (9) estimates of the cost of collecting, reviewing and producing responsive hard copy and electronic (non-email) documents, and making additional hard copy documents available for the Trustee to inspect and copy in FTN's offices.  Defendants predict that the above tasks would require between 286 and 4,668 hours, with the large variance in hours being dependent upon whether it is feasible for the large volume of electronic, non-email documents on FTN's network drive to be inspected by Plaintiff without Defendants' reviewing those materials

---

[13]/   For example, the parties may decide to use a narrower list of email search terms.  It may also be possible to reduce the number of electronic documents to review by moving to a different review platform that is capable of eliminating "near-duplicate" documents (*e.g.*, emails sent to offices in different time-zones that have different time-stamps but are otherwise identical) and identifying categories of non-responsive materials in bulk.

in advance in their entirety, a possibility that Defendants are currently exploring.[14]

**Emails and Attachments.**  With respect to emails and attachments, Defendants estimate the total cost of production would be approximately **$2.5 million**.[15]  This estimate is based upon: (1) discussions with FTN personnel to identify current and former FTN employees who are likely to have sent or received emails containing responsive material; (2) lists of search terms prepared by Defendants that were applied to the archived e-mail files of approximately 40 current and former employees; (3) estimates of the approximate number of attorney hours necessary to review emails and attachments; and (4) estimates of the percentage of privileged emails and attachments and the time required to prepare privilege logs.

Utilizing the de-duplication and review platform that Defendants have utilized to date, Defendants' searches generated approximately 381,841 emails and attachments that would need to be reviewed for responsiveness and privilege.  Defendants anticipate that this review would take approximately 12,447 hours for a team comprised of contract attorneys, staff attorneys, and associates.

## CONCLUSION

Defendants respectfully submit that they should be afforded the opportunity to complete Phase I discovery on the authorization/ratification issue and complete briefing on Defendants' anticipated motion for partial summary judgment before full merits discovery begins.

Dated:  June 9, 2010                         Respectfully submitted,


                                             /s/ Michael B. Slade
                                             Brian D. Sieve, P.C. (ARDC #6199741)
                                             Michael B. Slade (ARDC #6274231)
                                             KIRKLAND & ELLIS LLP

---

[14]     The low end of the hours estimate includes the time associated with simply preparing hard copy and non-email electronic documents for inspection and copying in FTN's offices (assuming that is feasible with respect to the large volume of materials on FTN's network drive). The high end assumes that the Plaintiff's inspection of materials on the network drive is not feasible and includes the time required to:  (1) prepare hard copy materials for inspection and copying; and (2) review the large volume of electronic, non-email documents on the network drive utilizing search terms (similar to the manner in which emails are searched).

[15]     The above estimated costs for all types of documents do not include fees charged by third-party vendors to host the documents that are reviewed and maintained electronically in databases.

300 North LaSalle
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Howard M. Shapiro
Craig Goldblatt
John A. Valentine
WILMER CUTLER PICKERING HALE
   AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Mark D. Griffin
Lori H. Patterson
Kristine L. Roberts
BAKER, DONELSON, BEARMAN, CALDWELL
   & BERKOWITZ, PC
First Tennessee Building
165 Madison Avenue, Suite 2000
Memphis, Tennessee  38103
Telephone:  (901) 526-2000
Facsimile:  (901) 577-0870

***Attorneys for Defendants and Third-Party Plaintiffs
Stephen M. Folan, Jacques de St. Phalle, and FTN
Financial Securities Corp.***

William Gibbs Sullivan
Royal B. Martin
Mason N. Floyd
MARTIN, BROWN, SULLIVAN, ROADMAN
      & HARTNETT, LTD
135 S. LaSalle St., Ste. 3200
Chicago, IL 60603
Phone: 312-360-5000

***Attorneys for Jacques de St. Phalle and Stephen M.
Folan***

12

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the Court, which caused it to be served upon the following counsel of record via the Court's ECF system, on this 9th day of June, 2010:

Chris C. Gair
James Kevin McCall
Jeffrey S. Eberhard
Gregory M. Boyle
Anne Paffrath Ray
Kevin Case
Vincent E. Lazar
JENNER & BLOCK LLP
353 North Clark Street
Chicago , IL 60654
***Attorneys for Frederick J. Grede, as Trustee for Sentinel Management Group, Inc.***

/s/ Michael B. Slade

13