**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FREDERICK J. GREDE, as Liquidation Trustee of the Sentinel Liquidation Trust, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08CV6587 |
| v. | ) ) | Hon. James B. Zagel |
| STEPHEN M. FOLAN, et al., | ) ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| FREDERICK J. GREDE, as Liquidation Trustee of the Sentinel Liquidation Trust, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 09CV2258 |
| v. | ) ) | Hon. James B. Zagel |
| FTN FINANCIAL SECURITIES CORP. et al., | ) ) ) | |
| Defendants. | ) ) | |

**SUPPLEMENTAL AND AMENDED STATEMENT OF UNDISPUTED MATERIAL
FACTS OF DEFENDANTS STEPHEN M. FOLAN, JACQUES DE SAINT PHALLE,
FTN FINANCIAL SECURITIES CORP., AND FIRST TENNESSEE BANK, N.A.'S IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a)(3), Stephen M.

Folan, Jacques de Saint Phalle, FTN Financial Securities Corp. ("FTN"), and First Tennessee

Bank, N.A. (collectively "Defendants") submit this Statement of Undisputed Material Facts in

Support of their motions for summary judgment on: (1) all counts of the Second Amended

Complaint of plaintiff Frederick J. Grede ("the Trustee") in No. 08CV6857, and (2) both counts

of the Trustee's Third Amended Complaint in No. 09CV2258. (Because of the overlap between

the two cases, and for the Court's convenience, one statement is submitted for both cases.)

## UNDISPUTED FACTS

1.      Plaintiff is the Liquidation Trustee for the estate of Sentinel Management Group, Inc. ("Sentinel").  Second Am. Compl. ¶ 9.[1]  Sentinel filed for bankruptcy on August 17, 2007. Second Am. Compl. ¶ 175.  Grede was appointed the Trustee under Section 1104 of the Bankruptcy Code by orders from the Bankruptcy Court of the Northern District of Illinois, dated August 23, 2007, and August 29, 2007.  Second Am. Compl. ¶ 9.

2.      Sentinel was a cash manager for hedge funds, futures commission merchants, and other entities and high net worth individuals.  Second Am. Compl. ¶ 2; Ex. 001 (Sentinel website, at TRST1291296).  Internet marketing materials described Sentinel's objective as "preservation of capital and liquidity in even the most turbulent of market conditions," and stated, among other things, that its customers' assets would be "invested in U.S. Treasury obligations or other high quality, marketable securities issued by U.S. agencies, corporations, and banks," unless a client "specifically directed" Sentinel to "seek higher yield in somewhat lower quality issues."  Second Am. Compl. ¶ 34.

3.      In addition to managing money for customers, Sentinel managed a "House" or "Street" portfolio of investments for Sentinel insiders, including Eric A. Bloom, Sentinel's president and chief executive officer; Philip M. Bloom, the chairman of the board and also an officer; and Charles K. Mosley, a senior vice president and the firm's head trader.  Second Am. Compl. ¶ 21.

4.      Sentinel was registered with the Securities and Exchange Commission as an investment adviser, and with the Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM").  Second Am. Compl. ¶ 10.

---

[1] Unless otherwise noted, all citations herein to a complaint are to the operative complaint in No. 08CV6857

5.     Stephen M. Folan is a resident of Plainfield, Illinois.  During the events in question, he was employed as a broker by FTN.  Folan was a broker in FTN's Chicago office who provided brokerage services to Sentinel for Preferred Term Securities Limited ("PreTSLs") and other securities.  Second Am. Compl. ¶ 11.

6.     Jacques de Saint Phalle is a resident of Greenwich, Connecticut.  Between February 2006 and July 2007, he was employed as a managing director in FTN's Structured Finance Group.  Second Am. Compl. ¶ 12.  He was also employed in the Capital Markets operating segment of First Tennessee Bank N.A.  *Id.*  He was involved in the sale of PreTSLs and other securities to Sentinel.  Prior to joining FTN, he worked for Keefe Bruyette & Woods, Inc. ("KBW"), which co-created and co-marketed PreTSLs with FTN.  Second Am. Compl. ¶¶ 12, 35, 59.

7.     FTN is a corporation organized under the laws of Tennessee; its principal place of business is in Memphis, Tennessee.  Second Am. Compl. ¶ 13.  FTN is a subsidiary of First Tennessee Bank N.A.  *Id.*  FTN is registered with the SEC and the Financial Industry Regulatory Authority ("FINRA") as a broker-dealer.  *Id.*

8.     First Tennessee is a banking institution chartered by the Office of the Comptroller of the Currency.  Its principal place of business is in Memphis, Tennessee.  Second Am. Compl. ¶¶ 13, 14.

9.     PreTSLs are a type of collateralized debt obligation, backed by "trust preferred securities" issued primarily by banks and savings and loans, which "pay interest like debt securities" but which are "treated as capital for regulatory purposes" by the issuers of those securities.  Second Am. Compl. ¶ 24.

10. Sentinel's website stated that "clients have an indirect, undivided pro-rata ownership interest in a pool of high quality, liquid securities…. All securities are delivered and held in Sentinel's omnibus custody account at The Bank of New York." Ex. 001 (Sentinel Website, at TRST12912083). The website further stated that Sentinel "can customize a client's portfolio to suit individual preferences for maturity and target yield," (*id.* at TRST12912070-72), and that "clients who do not need daily liquidity for the entire amount of their investment can authorize Sentinel to invest for longer periods," (*id.* at TRST12912085).

11. Senior FTN managers, including Rod Turner and Mike Kisber, were aware of these statements on Sentinel's website. ████████████████████████████████ ████████████████████████████; Ex. 160 (Deposition of Michael Kisber, hereinafter "Kisber Tr.," ████████████ 2/2/11, 279:16-21, 288:7-17). Both Folan and de St. Phalle understood Sentinel to have portfolios for both highly liquid securities and less liquid, high-yield securities. Ex. 003 (Deposition of Stephen Folan, hereinafter "Folan Tr.," 5/4/11, at 35:4-36:5); Ex. 052 (Deposition of Jacques de St. Phalle, hereinafter "de St. Phalle Tr.," 12/17/10, at 129:1-8). Based on that, Sentinel's history of purchasing PreTSLs for several years, Sentinel's investment in different CDOs similar to PreTSLs and other complex products, Mosley's sophistication as a bond trader, his familiarity with the product, and his representation that Sentinel had portfolios for which PreTSLs were suitable (including an "aggressive" portfolio for which unrated PreTSL income notes were suitable), Folan, de St. Phalle, Kisber, and Turner believed that PreTSLs were an appropriate investment for Sentinel. Ex. 003 (Folan Tr., 5/4/11, at 131:20-136:12); Ex. 052 (de St. Phalle Tr., 12/17/10, at 127:19-134:7); Ex. 160 (Kisber Tr., at 387:3-388:10); ████████████████████ ████████████████████ ████████; Ex. 085 (Deposition of Frank Gusmus, hereinafter "Gusmus Tr.," 1/26/11 at 259:7-

14). Several employees from FTN's Structured Finance Group, which was responsible for structuring PreTSLs, also met with Mosley on several occasions, believed that he was sophisticated, and felt that PreTSLs were appropriate for Sentinel. *See, e.g.*, Ex. 172 (Deposition of Doug Duncan, 1/27/10, at 98:4-12, 116:2-20); Ex. 173 (Deposition of R. Davis Howe, 3/10/11, at 327:7 - 328:4, 360:12-363:7); Ex. 174 (Deposition of Jim Wingett, 1/28/11, at 97:4-19)

12.     All of the brokers from other firms who were deposed in this case believed that Sentinel could appropriately invest in CDOs based on Sentinel's website and their discussions with Mosley. ██████████████████████████; Ex. 005 (Deposition of Joe Hornback, 6/7/11, at 95:3-22).

13.     Before investing with Sentinel, each Assigning Customer executed an Investment Management Agreement ("IM Agreement"). These agreements stated:

1.     <u>Appointment</u>

Client hereby appoints Sentinel and Sentinel hereby accepts appointment as discretionary investment adviser with respect to those assets deposited with the Custodian (as defined in Section 5) and accepted for investment by Sentinel (the "Assets") for Investment in the Sentinel program (hereafter, the "Program") identified in the New  Account Information form attached hereto as Schedule A.[2]

2.     <u>Discretionary Authority</u>

---

[2] Prior to 2005, Sentinel's appointment clause in its Investment Agreements stated: "Client hereby appoints Sentinel and Sentinel hereby accepts appointment as discretionary investment adviser with respect to those assets deposited with the Custodian (as defined in Section 5) and accepted for investment by Sentinel (the "Assets")." Ex. 012 (J.E. Moody & Co., LLC Investment Advisory Agreement, hereinafter "Moody IAA," August 27, 2001); Ex. 015 (Lake Shore Alt. Financial Assett Ltd., (Income & Operating) Investment Advisory Agreement, hereinafter "Lake Shore Income & Operating IAA," July 24, 2001); Ex. 016 (Lake Shore Alt. Financial Asset (Trading 2) Investment Advisory Agreement , hereinafter "Lake Shore Trading 2 IAA," June 28, 2001); Ex. 020 (Rotchford L. Barker Investment Advisory Agreement, hereinafter "Barker IAA," August 19, 2004); ██████████████████████████; Ex. 022 (Stone Capital Investment Advisory Agreement, hereinafter "Stone Capital IAA," July 31, 2000).

> Subject to any restrictions provided to Sentinel in writing, Sentinel shall have the sole power and discretion to direct the investment of the Assets on behalf of Client and at Client's sole risk until Sentinel receives written notice of termination by Client. Pursuant to such authorization, Sentinel may purchase, sell, exchange, convert and otherwise trade securities in the Account, arrange for delivery and payment in connection therewith, and act on behalf of Client in all other matters necessary or appropriate to the investment of the Assets, all without prior consultation with or notification to Client. Sentinel may receive and act upon instructions from Authorized Persons."

*See* Ex. 007 (BC Capital Brokerage Services, LLC Investment Management Agreement, hereinafter "BC Capital Brokerage IMA," July 12, 2006); Ex. 008 (BC Capital Fund A Investment Advisory Agreement, hereinafter "BC Capital Fund A IAA," March 24, 2005); Ex. 009 (BC Capital Fund B Investment Management Agreement, hereinafter "BC Capital Fund B IMA," January 31, 2006); ███████████████████████████████ ███████████████████████; Ex. 011 (GLS Futures Fund, L.P. Trading Investment Management Agreement, hereinafter "GLS IMA," June 26, 1997); Ex. 012 (Moody IAA); Ex. 013 (Jump Trading Investment Management Agreement, hereinafter "Jump IMA," May 30, 2006); ██████████████████████████████████ ████████; Ex. 015 (Lake Shore Income & Operating IMA); Ex.016 (Lake Shore Trading 2 IMA); Ex. 017 (Leviathan Diversified Fund IXL Investment Management Agreement, hereinafter "Leviathan IXL IMA," August 25, 2006); Ex. 018 (Leviathan Diversified Fund 3XL Investment Management Agreement, hereinafter "Leviathan 3XL IMA," August 25, 2006); Ex. 019 (Oxbow Investment Management Agreement, hereinafter "Oxbow IMA," June 17, 2005); Ex. 020 (Barker IAA); █████████████; Ex. 022 (Stone Capital IMA); Ex. 023 (TransAct Futures Investment Management Agreement, hereinafter "TransAct IMA," March 16, 2006); Ex. 024 (Vision Ltp. Partnership Investment Management Agreement, hereinafter "Vision IMA," November 24, 2006); Ex. 025 (William DiSomma Investment Management Agreement,

hereinafter "DiSomma IMA," January 22, 2007); Ex. 026 (2100 Capital Multi-Strategy Master

Fund Ltd., hereinafter "2100 IMA," June 23, 2006); Ex. 208 (UNIQ Diversified Fund, L.P.

Investment Management Agreement, hereinafter "UNIQ IMA," August 27, 2001); Ex. 209 (BC

Capital Fund A, LLC Subscriptions Investment Management Agreement, March 24, 2005).

14.     In each IM Agreement, the Assigning Customer acknowledged that it had

"received and reviewed Part II and Schedule F of Sentinel's Form ADV." ▮▮▮▮▮▮▮; *see*

*also* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 028 (Deposition of Steven Schnur,

hereinafter "Schnur Tr.," 5/11/11, at 120:13-21 (noting that 2100 Capital specifically requested

Sentinel's Form ADV prior to investing).

15.     As of 2007, Sentinel's Form ADV stated as follows:

Clients generally hold undivided interests in a pool of securities that meet the risk
characteristics, e.g., rating, maturity and issuer, they have specified. The Registrant
purchases securities on behalf of its clients with the view of holding the securities to
maturity while collecting the interest earned thereon and allocating income to clients with
interest in that pool. There are instances where the Registrant may sell securities in a
given pool prior to maturity. A sale of a security may result in a gain or loss ….

* * *

Income, which is defined as coupon interest and amortization of bond premium or
discount, using the amortized cost method, is divided pro rata among the clients
participating in each pool. In all cases, income, calculated as a percentage of return
(rounded to the nearest 100th of a percentage point based on conventional rounding
procedures)., is allocated among clients in accordance with their respective interests in
each pool. The rate of return to all clients with interests in a given pool will vary only if
and to the extent that the clients have negotiated different fee arrangements with the
Registrant.

Ex. 038 (Form ADV of Sentinel Management Group, Inc., Schedule F, 3/16/07, at

TRST12079827). In prior years, the Form ADV contained substantially similar language. Ex.

039 (Form ADV of Sentinel Management Group, Inc., Schedule F, 3/28/04, at TRST04606411);

Ex. 040 (Form ADV of Sentinel Management Group, Inc., Schedule F, 3/22/05, at

TRST00000706); Ex. 041 (Form ADV of Sentinel Management Group, Inc., Schedule F,

3/21/06, at TRST01365859); *see also* Ex. 042 (Form ADV of Sentinel Management Group, Inc.,

Schedule F, 8/8/02, at TRST04606326); Ex. 043 (Form ADV of Sentinel Management Group,

Inc., Schedule F, 6/27/01, at TRST04651818); Ex. 044 (Form ADV of Sentinel Management

Group, Inc., Schedule F, 3/26/99, at TRST04651780); Ex. 045 (Form ADV of Sentinel

Management Group, Inc., Schedule F, April 14, 1997, at TRST04651744).

16.     Many of the Assigning Customers also signed an IM Agreement that included a

"Schedule A" specifically directing Sentinel to place the customer's assets in one of Sentinel's

pooled investment portfolios or the "so called 'Prime Portfolio.'"  *See* Ex. 008 (BC Capital Fund

A IAA, Schedule A); ███████████████████████████; Ex. 011 (GLS IMA, Schedule A); ███

███████████████████; Ex. 015 (Lake Shore Income & Operating IMA, Schedule A);

Ex. 016 (Lake Shore Trading 2 IAA, Schedule A); Ex. 017 (Leviathan IXL IMA, Schedule A);

Ex. 018 (Leviathan 3XL IMA, Schedule A); Ex. 020 (Barker IAA, Schedule A); Ex. 025

(DiSomma IMA, Schedule A); ███████████████████████; Ex. 205 (Jump Trading,

Signed Schedule A, 6/12/06); Ex. 206 (Jump Trading, Signed Schedule A, 7/6/06).

17.     Starting in 2005, the IM Agreements also stated that the customer's assets would

be invested along with the assets of other customers.  Section 5(d) stated:

> Client's Assets in a particular Program will be invested along with the assets of other
> Sentinel clients in the same Program.  Client acknowledges that it will own an indirect
> interest in the segregated portfolio of the Program identified on Schedule A and will be
> responsible for any losses, if any, pro-rata in such portfolio, less any replenishment from
> the Sentinel reserve account maintained for such portfolio.  The reserve account is
> comprised of gains realized by the portfolio, net of taxes, for the benefit of clients in that
> Program whose cash balance may be less than the market value of the securities in their

account at the time of withdrawal and closing of the account and will be applied, if
appropriate, pro-rata at such time.

Ex. 007 (BC Capital Brokerage IMA); Ex. 008 (BC Capital Fund A IAA); Ex. 009 (BC Capital

Fund B IMA); ███████████; Ex. 013 (Jump IMA); Ex. 017 (Leviathan IXL IMA); Ex.

018 (Leviathan 3XL IMA); Ex. 019 (Oxbow IMA); Ex. 023 (TransAct IMA); Ex. 024 (Vision

IMA); Ex. 025 (DiSomma IMA); Ex. 026 (2100 IMA); *see also* ████████████

███████████████████████████; Ex. 028

(Schnur Tr. at 235:13-16) (explaining customer's statements represented 2100 Capital's share of

assets in the pooled portfolio).

18.     Several customers who assigned their claims to the Trustee (the "Assigning

Customers") acknowledged in depositions their understanding that their investments in the Prime

or 125 accounts were pooled investment funds that contained the funds of both the customer and

other investors. *See, e.g.,* ███████████████████████

███████████████████████████

████████████████; Ex.028 (Schnur Tr. at 235:13-16) (explaining

customer's statements represented 2100 Capital's share of assets in the pooled portfolio).

19.     All of Sentinel's Assigning Customers, except for the Lake Shore customer

entities, whose chief principal has not yet been deposed and to our understanding intends to

exercise his Fifth Amendment right, have acknowledged their understanding that their assets had

been placed in either the 1.25 Portfolio or the Prime Portfolio. *See* Ex. 029 (Deposition of

Gregory Srodon, hereinafter "Srodon Tr.," 5/10/11, at 104:13-25); Ex. 030 (Deposition of Bryan

Nelson, 6/17/11, at 10:14-15); ████████████████████████;

████████████████████████; Ex. 033

(Deposition of William DiSomma Deposition, 6/8/11, at 35:22-24); Ex. 034 (Deposition of Brian

Sass, hereinafter "Sass Tr.," 5/24/11, at 44:19-21); ███████████████████████████

███████████████████████████████; *see also* Ex. 207 (call between Moody and

York asking to confirm whether JE Moody account is in the prime or 125 portfolio, 1/2/07

YorkWAV513E, at 2:22-3:11); █████████████████████████████████████████

███████████████████; ███████████████████; ███████████████████

██████████████████████████████; Ex. 028 (Schnur Tr. at 124:13-

15); Ex. 171 (Deposition of Tim Currie, hereinafter "Currie Tr.," 5/24/11, at 242:18-25, 274:5-

7); Ex. 165 (Deposition of Jacques Sauliere, 6/8/11, at 99:25-100:8); Ex. 166 (Deposition of

Oulvey, hereinafter "Oulvey Tr.," 6/20/11, at 54:16-17); Ex. 167 (Deposition of Thomas Stone,

hereinafter "Stone Tr.," 4/28/11 at 96:19-21).

20.     A large majority of Sentinel's customers have acknowledged that they were

passive investors and that they allowed Sentinel to make all investment decisions for the money

they invested with Sentinel. ████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████; █████████████████████████

█████████████████████████████████████; ███████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████



(Currie Tr. at 116:3-20) (did not concern himself with Sentinel's investments because developed a comfort level and believed Sentinel was investing in investment-grade securities); Ex. 029 (Srodon Tr. at 111:15-25-112:6) (testifying that he did not ask Sentinel about securities on its account statement that he did not understand or recognize because he "relied on [Sentinel's] expertise" and that he never called Sentinel about GLS's account statements); ▮▮▮▮▮▮

; Ex. 166 (Oulvey Tr., 6/20/11 at 93:21-94:5) (stating that SMW did not have any procedures in place to monitor its investments with Sentinel); Ex. 167 (Stone Tr. at 84:16-21) (other than occasional review of customer statements and financial statements, had no procedures in place to monitor investments with Sentinel); Ex. 034 (Sass Tr. at 101:18-102:8) (did not provide any written restrictions on Sentinel's discretionary authority); *id.* at 104:3-14 (understood that Sentinel needed discretionary authority to trade in the account).

21. Several of Sentinel's customers reviewed Sentinel's website. ▮▮▮▮▮

; Ex. 028 (Schnur Tr. at 81:5-12) (witness believed that he reviewed Sentinel's website before investing).

**Sentinel's Leveraged Investment Scheme & Business with FTN**

22. Sentinel engaged in "a massive leveraging scheme that was concealed from Sentinel's customers and regulators" from at least 2003 until August 2007. Second Am. Compl.

¶ 30.  The scheme involved Sentinel using customer assets as collateral for a credit line and repurchase agreements that financed "billions of dollars" of House Portfolio investments in higher-yielding, riskier instruments, such as PreTSLs and similar securities.  Second Am. Compl. ¶¶ 30-31 43-44; *Grede v. Bank of New York*, No. 07 B 14987, Adv. No. 08-127, Second Am. Compl. ¶¶ 102, 110, Dkt. No. 427 (Bankr. N.D. Ill. Mar. 3, 2008); *Grede v. Bloom*, No. 07 B14987, Adv. No. 07-981, First Am. Compl. ¶ 38, Dkt. No. 253 (Bankr. N.D. Ill. Oct. 11, 2007) ("Bloom First Am. Compl."); ████████████████████████████

████████████████.  As Sentinel's head trader, Mosley purchased securities for the House Portfolio under the supervision of Eric and Philip Bloom, who were not only aware of the leveraging scheme, but also approved and created financial incentives for Mosley to carry it out. Bloom First Am. Compl. ¶¶ 5, 33, 41, 44, 48, 55, 65-66, 69, 72.  In particular, Mosley received an annual bonus equal to 10% of the trading profits in the House portfolio. ████████████

████████████████████████; Bloom Compl. ¶ 66; Ex. 178 (e-mail chain between Mosley and Eric Bloom, 1/18/07, at TQ0594315) (discussing Mosley's bonus with him, Eric Bloom states, "[w]e did well so you should do well too. That was the spirit of our agreement and that is how I feel."); ████████████████████████████.

23.    For a time, Sentinel's scheme produced favorable returns both for Sentinel insiders and customers.  "Beginning in the summer of 2007, the tightening of the global credit markets threw the securities markets into turmoil, prompting repo lenders to demand repayment of their outstanding loans and causing a "liquidity crisis" at Sentinel that ultimately "led to [its] collapse."  Second Am. Compl. ¶ 169.

24.    Sentinel became a client of FTN in October 2004 when FTN acquired the fixed income division of Spear, Leeds & Kellogg ("SLK").  Ex. 003 (Folan Tr., 5/4/11, at 15:12-23)

(explaining how Folan spoke to his client, Mosley, about the possibility of his SLK division being bought by FTN). Folan was a registered sales representative in SLK's Chicago office,

██████████████████████████████████████████████████████████

████████████████████████████████.

25.     Before 2005, Sentinel had made all of its PreTSL purchases exclusively from KBW and other brokers, having purchased more than $82 million of them from KBW. Ex. 048 (Trustee's Objs. and Resps. to Def. First Tenn. Bank's First Set of Interrogs., 2/23/11, Resp. No. 7, at 21-26). After Folan moved to FTN, Sentinel began to purchase PreTSLs from FTN as well. FTN's first PreTSL sale to Sentinel was a mezzanine note in March 2005. Ex. 049 (All FTN Trades with Sentinel, Jan. 1, 2004 – Dec. 31, 2007, at Grede v Folan-FTN-0797871-893).

26.     In 2005, Mosley purchased only eight PreTSLs from FTN while purchasing 28 from KBW. Ex. 048 (Trustee's Objs. and Resps. to Def. First Tenn. Bank's First Set of Interrogs., 2/23/11, Resp. No. 7, at 21-26). Moreover, it was Mosley, not Folan, who first suggested that Sentinel start purchasing PreTSLs from FTN. Ex. 050 (call between Mosley and Blindt and call between Mosley and Silvers, 1/16/07, MosleyWAV4F48, at 44:24-45:6).

27.     De St. Phalle left KBW and joined FTN as the managing director of its Structured Finance Group in February 2006. Ex. 052 (de St. Phalle Tr. at 44:22-45:5). Mosley had worked with de St. Phalle on PreTSL investments at KBW, and continued to so after he joined FTN. *Id.* at 43:5-12. Sentinel's first purchase of a PreTSL income note from FTN took place in March 2006, a month after de St. Phalle joined FTN. Ex. 049 (All FTN Trades with Sentinel, Jan. 1, 2004 through Dec. 31, 2007, at Grede v Folan-FTN-0797871-893).

28.     Over 2006, Sentinel shifted its PreTSL business away from KBW to FTN. Several factors contributed to this move. First, in early 2006, Mosley's day-to-day sales contact

at KBW, Doli Rodriguez, and KBW's PreTSL trader, Barry Mohr, both left to join Cohen

Brothers. Ex. 053 (Deposition of Barry Mohr, 4/30/10, at 55:1-16, 56:21-57:4). Then, in May

2006, a former KBW employee told Mosley that a KBW manager was attempting to get him

fired in order to replace Mosley with the manager's "puppet." Ex. 054 (call between Mosley and

Mohr, 5/8/06, MolseyWAVA166, at 10:19-11:7, 21:20). Although Mosley reacted to this news

at the time by stating that he "want[s] to just shut [KBW] out altogether," he still conducted

business with KBW because they had PreTSLs. *Id*. at 43:18-19.

29.     In the fall of 2006, KBW and Sentinel had a dispute over KBW's sale of restricted

securities to Sentinel. Ex. 055 (call between Charles Mosley and Bob Rogoz , 10/19/06,

MosleyWAV6EAF, at 7:7-17) ("KBW has screwed me over a couple of times … and to me this

is yet another instance of where something was misrepresented … you're saying you have no

culpability ... I mean, that's fine … we'll cease doing business with you."); Ex. 056 (Sentinel

Credit Committee Minutes, 11/7/06, at TRST04646868-70). As a result of this string of

conflicts, Sentinel made the decision to cease purchasing PreTSLs from KBW. Ex. 057

(Sentinel Credit Committee Minutes, 1/10/07, at TRST04646865-67) (removing KBW from

Sentinel's list of approved counter-parties).

30.     After Mosley began purchasing PreTSLs from FTN, he often rejected offers from

FTN to buy or sell PreTSLs. *See, e.g.*, Ex. 058 (call between Mosley and Folan, 3/30/06,

MosleyWAVB175, at 3:7-24); Ex. 059 (call between Mosley and Folan, 4/3/06,

MosleyWAVA94F, at 3:10-4:9); Ex. 060 (call between Mosley and Folan, 5/30/06,

MosleyWAVA1FC, at 5:1-7:9); Ex. 061 (call between Mosley and Folan, 5/16/07,

MosleyWAV1F50, at 3:13-14, 4:13-18).

31.     In March 2006, Mosley asked FTN to buy $8 million in PreTSL 19 combo notes for reasons related to its balance sheet and bank loan. Ex. 062 (call between Mosley and Folan, 3/29/06, MosleyWAVB15A, at 3:19-4:22). Mosley initially told Folan that he wanted to sell PreTSL income notes "for our balance sheet," explaining that "these things we can't lend out.… They're sitting at our bank so they, give us a loan, … so it blows us up … inflates what we have." *Id*. at 4:3-21. Folan attempted to interpret Mosley's explanation at one point by suggesting that it "cost you money to do that." *Id*. at 4:16-17. In response, Mosley reiterated: "Right. And it … inflates what we have…." *Id.* at 4:18-21. Mosley repeated this explanation in a subsequent call that day with both Folan and Alan Jankowski, FTN's PreTSL trader, adding that "we want to make our loan look lower … so literally -- I mean I just have to have it off by the end of the month … [and] can buy it back the next day…." Ex. 063  (call between Mosley, Folan, and Jankowski, 3/29/06, MosleyWAVB15C, at 4:20-5:14).

**Investment Risk Disclosures to Sentinel**

32.     The PreTSL offering circulars provided to Sentinel by FTN warned that "[t]here is no market for any of the Notes being offered hereby and, as a result, a purchaser must be prepared to hold the Notes for an indefinite period of time or until the maturity thereof." *See, e.g*., Ex. 064 (PreTSL XXI Final Offering Circular, TRST05865867, at  20). The offering circulars further explained that the "notes will be owned by a relatively small number of investors," that it was "highly unlikely that an active secondary market" would develop, and that it might be "difficult or uneconomic to liquidate" the notes "at any particular time." *Id*. at 21. The offering circulars also laid out the heightened risk of loss associated with PreTSL income notes:  "purchasers of the Income Notes bear a high risk of losing all or part of their investment." *Id* at 20.

33.     Sentinel received these offering circulars for every security on which the Trustee seeks damages. *See, e.g.*, Ex. 065 (e-mail from Gina Douglas to Mosley attaching PreTSL XIX Offering Circular and Memo., 10/13/05, at TRST07836412); Ex. 066 (e-mail from Douglas to Jeff Logan attaching Offering Circulars for PreTSL IV, XX, and XXII, and Offering Memo. for PreTSL XX-1 to XX-3, and XXIII-1 to XXIII-5, 1/8/07, at TRST05599941); Ex. 064 (e-mail from Abhi Vyas to Cynthia Madrigal attaching Offering Circular for PreTSL XXI, 1/18/07, at TRST05865867); Ex. 067 (e-mail from Folan to Anjene Abston attaching Offering Circular for PreTSL XIV, XIX, XXI, XX, and Offering Memo. for PreTSL Combo XX-1 to XX-3, 8/15/07, at TRST11890856-57); *see also* Ex. 099 (Deposition of Gina Douglas, hereinafter "Douglas Tr.," 3/8/11, at 28:24 - 29:16) (testifying that Sentinel was sent the PreTSL offering circulars).

34.     When Sentinel bought PreTSLs from FTN, Molsey signed representation letters acknowledging that Sentinel did not rely and "will not rely (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of FTN Financial or any Issuer, other than [the statements made in the Offering Circular]." Ex. 068 (Grede v Folan-FTN-0001703-10, at 0001703). By signing the representation letters when buying PreTSLs, Sentinel also represented that they "consulted and will consult with our own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent we deem necessary and have made and will make our own investment decisions (including decisions regarding the suitability of any purchases of Securities) based upon our own judgment and upon any advice from such advisers as we have deemed necessary and not upon any view expressed by FTN Financial or any Issuer." *Id.*

35.     Sentinel's representation letters stated that: (1) it was a Qualified Institutional Buyer ("QIB") that met the requirements for purchasing PreTSLs, which meant that the buyer

had $100 million that it invested on a discretionary basis; (2) it would not rely on Defendants'
representations about PreTSLs and other securities; and (3) it would make its own suitability
determinations.  Ex. 179 (Signed Representation Letter, 3/17/05, Grede v Folan-FTN-0001711);
Ex. 180 (Signed Representation Letter, 10/13/05, Grede v Folan-FTN-0001682); Ex. 181
(Signed Representation Letter, 12/15/05, Grede v Folan-FTN-0001695); Ex. 182 (Signed
Representation Letter, 4/3/06, Grede v Folan-FTN-0001731); Ex. 183 (Signed Representation
Letter, 9/21/06, at Grede v Folan-FTN-0001775); Ex. 184 (Signed Representation Letter,
1/10/07, Grede v Folan-FTN-0001671); Ex. 185 (Signed Representation Letter, 2/15/07, Grede v
Folan-FTN-0001819); Ex. 186 (Signed Representation Letter, 3/22/07, Grede v Folan-FTN-
0001720); Ex. 187 (Signed Representation Letter, 4/5/07, Grede v Folan-FTN-0001786); Ex.
188 (Signed Representation Letter, 6/21/07, at Grede v Folan-FTN-0001742).

36.     On December 12, 2005, Mosley executed a "global" representation letter with
FTN that provided, with respect to "all purchases by [Sentinel] from time to time of securities …
that are placed or sold by [Defendants]," (1) "[w]e have not relied and will not rely (for purposes
of making any investment decision or otherwise) upon any advice, counsel or representations
(whether written or oral) of FTN Financial or any Issuer, other than, solely in the case of any
Issuer, any statements in an offering document related to an issuance of the related Securities"; and
(2) "[w]e have consulted with and will consult with our own legal, regulatory, tax, business,
investment, financial and accounting advisers to the extent we deem necessary and have made and
will make our own investment decisions (***including decisions regarding the suitability of any
purchase of Securities***) based upon our own judgment and upon any advice from such advisers as
we have deemed necessary and not upon any view expressed by FTN Financial or any Issuer."  Ex.
189 (Signed Representation Letter, 12/12/05, at Grede v Folan-FTN-0001695) (emphasis added).

37. Sentinel's management team was aware that Mosley was purchasing PreTSLs from FTN. *See, e.g.*, Ex. 078 (e-mail chain between Mosley and E. Bloom, 12/6/06, at TQ2519126) (Mosley telling E. Bloom that "equity tranche" PreTSLs are "very illiquid."); Ex. 190 (call between Mosley and P. Bloom, 9/6/06, MosleyWAV7959, at 5:15-22) (Mosley tells P. Bloom that Sentinel purchases PreTSLs from FTN). Philip and Eric Bloom received daily account statements listing all of the securities, including PreTSLs, in the Sentinel House Account. Ex. 070 (Account Statement, 3/6/06, at TQ7801119-20); Ex. 071 (e-mail from Sentinel Management to P. Bloom, 11/18/05, TQ7674910-11); Ex. 072 (e-mail from Sentinel Management to E. Bloom, 3/8/06, TQ0599055-56). Sentinel's trades were entered into Sentinel's books, and Eric Bloom and CFO Teresa Arana received notice of those transactions through Sentinel's computerized POMS system. ███████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████; Ex. 073 (e-mails from Logan to E. Bloom, 4/4/07, at TQ6138939, TQ6138941, TQ6138943).

38. Mosley, Eric Bloom, and other members of Sentinel's Credit Committee, including Arana and Keel, periodically discussed Sentinel's PreTSL holdings. Ex. 074 (Sentinel Credit Committee Minutes, 2/20/07); Ex. 056 (Sentinel Credit Committee Minutes, 11/7/06); (Sentinel Credit Committee Minutes, 12/6/06); Ex. 057 (Sentinel Credit Committee Minutes, 1/10/07). There is no evidence that Bloom or any other member of Sentinel management ever suggested that Sentinel should stop purchasing PreTSLs. Ex. 075 (e-mails between Mosley and E. Bloom, 1/22/07, at TQ2559813).

39. Eric Bloom wrote to Mosley about the good returns from Sentinel's "house positions," which consisted largely of PreTSLs. Ex. 075 (e-mails between Mosley and E. Bloom,

1/22/07, at TQ2559813). Sentinel's management team was so pleased with the House Portfolio's performance that at the June 19, 2007, Credit Committee meeting, the committee "[d]iscussed [the] possibility of starting a new fund," which "would have [a] similar strategy of HSE account," but "would be [a] separate entity." Ex. 076 (Sentinel Credit Committee Minutes, 6/19/07, at TRST06730658).

40.     Recorded telephone conversations and e-mails between Mosley, Eric Bloom, and Phil Bloom show that Sentinel understood that high-yield securities such as PreTSL income notes were not liquid and entailed significant risk. Ex. 078 (e-mails between Mosley and E. Bloom, 12/6/06, at TQ2519126) (Mosley telling Bloom that PreTSLs are "very illiquid."); Ex. 075 (e-mails between Mosley and E. Bloom, 1/22/07, at TQ2559813) (Mosley noting that the physical securities in the House account are "illiquid."); Ex. 079 (call between Mosley and Folan, 2/22/06, MosleyWAVBB8E, at 4:23-6:12) (Mosley noting that he is not sure how much more liquid PreTSL income notes would be than another illiquid security); Ex. 077 (call between P. Bloom and E. Bloom, 5/2/07, BloomWAV27F0, at 5:18-8:11) (Phil Bloom: "How did [Charles] make so fuckin' much money?" … Eric: "[T]here is no mark to market …. Some of this stuff we've been holding since '05…. a lot of these are illiquid." Phil: "It's an awful lot of money … how indicative is this of risk?" Eric: "[O]bviously there's risk. But a lot of it is credit risk … a lot of stuff just isn't priced … [I]t is not like there's an exchange … [Charles] knows who trades it.… [But] we know who makes the market…."); Ex. 080 (call between Mosley and E. Bloom, 7/6/07, MosleyWAV337, at 7:7-17, 11:20-12:12).

41.     Sentinel's Credit Committee felt that the House Portfolio was so risky that in it its meeting on October 19, 2006, it decided that Jeff Logan and Cynthia Madrigal, Mosley's assistant traders, would have to move their accounts out of that portfolio. Ex. 081 (Sentinel

Credit Committee Minutes, 10/19/06 at TRST04646863) (noting that the "risk is most likely higher tha[n] they could tolerate").

42.     In various recorded conversations and e-mails in 2006 and 2007, Mosley noted that PreTSLs "trade by appointment," that the market for them is "esoteric," that they are "very illiquid," and "because of the way these things trade … it's like you have four opportunities a year." Ex. 079 (call between Mosley and Folan, 2/22/06, MosleyWAVBB8E, at 5:21-22); Ex. 082 (e-mails between Mosley and E. Bloom, 12/14/06, at TQ0055522); Ex. 075 (e-mails between Mosley and E. Bloom,  1/22/07, at TQ2559813); Ex. 083 (call between Mosley and Folan, 3/20/06, MosleyWAVB0F8, at 6:5-11); Ex. 084 (call between Mosley and Folan, 3/7/07, MosleyWAV3C7B, at 7:19-8:3); Ex. 078 (e-mail chain between Mosley, E. Bloom, Arana, Keel, and Logan, 12/6/06, at TQ2519126).

43.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████. During a call with Folan and de St. Phalle on November 21, 2006, in which de St. Phalle explained that FTN would be unlikely to provide liquidity beyond the $19 million in PreTSLs it had already repurchased, Mosley confirmed that Sentinel's reason for seeking liquidity at year-end was to satisfy customer redemption requests. He also explained that Sentinel needed to raise liquidity from its PreTSL holdings because: (a) account segregation requirements precluded Sentinel from selling rated securities from other accounts; (b) the rated securities in the portfolio that needed liquidity had already been repo'd; and (c) Mosley wanted to liquidate income notes from that portfolio because that would generate cash for the full value of those securities, as opposed to selling a rated security that was already

out on repo, which would generate only the incremental difference of the repo "haircut." *See* Ex. 086 (call between Mosley, Folan, and de St. Phalle, 11/21/06, MosleyWAV63E4, at 5:13-15:10).

44.     FTN President Frank Gusmus and FTN regional sales manager Rod Turner called Mosley on November 28, 2006, to discuss the request and Mosley told them that Sentinel's income notes were in a portfolio in which customers typically required liquidity for a brief period over year-end.  Mosley explained that he could not meet this portfolio's liquidity needs by selling other, more liquid securities, because they were in segregated portfolios.  Ex. 085 (Gusmus Deposition, 1/26/11, at 311:19-312:9); Ex. 193 (call between Mosley, Gusmus, and Turner, 11/28/06, MosleyWAV6405, at 3:7-4:11, 9:5-10:9).

45.     Following the call with Mosley on November 28, 2006, Gusmus referred Sentinel to FIMAT (a third party repo lender) for a portion of its needs.  In December 2006, Gusmus authorized a $25 million repo transaction with Sentinel to satisfy the rest of its needs for year-end.  After Sentinel purchased an approximately $5 million income note from FTN on January 8, 2007, Gusmus directed his sales managers to stop selling income notes to Sentinel as long as it needed liquidity from those investments, and asked Turner to review the Sentinel account.  Ex. 087 (Gusmus Tr., 1/20/11, at 162:18-163:10).

46.     Over the course of FTN's relationship with Sentinel, Mosley repeatedly represented to FTN employees that Sentinel had a portfolio for high-yield securities, ███

███████████████████████████████████████████████████████

███████████████████████████████████████████        *See* Ex. 088 (call between Mosley and de St. Phalle, 2/21/06 MosleyWAVBB74, at 6:10-18) (Mosley expressing interest in "high margin" securities to the Defendants); Ex. 089 (call between Mosley and Folan, 1/11/07, MosleyWAV4F2B, at 22:16-23:7) (Folan describing, without disagreement

- 21 -

from Mosley, his understanding that Sentinel has $300-$400 million that could be allocated to high-yield paper); Ex. 090 (call between Mosley, Turner, LeFreniere, and Folan, 1/11/07, MosleyWAV4F33, at 5:13-6:17) (Mosley telling Turner, LaFreniere, and Folan that Sentinel put income notes in a portfolio for FCM and hedge fund clients who wanted "a product that was a little more aggressive"); Ex. 091 (e-mail from Mosley to Folan, 1/17/07, Grede v Folan-FTN-2604412-413 (attaching HSE Portfolio investment guidelines); Ex. 092 (call between Mosley and Folan, 4/16/07, MosleyWAV2D6B, at 8:12-13) (Mosley referring to investments in "our hedge fund account, our house account"); Ex. 093 (call between Mosley, de St. Phalle and Folan, 6/25/07, MosleyWAV2EA, at 2:19-22) (Mosley confirming to de St. Phalle and Folan that Sentinel has a high-yield portfolio); Ex. 094 (call between Mosley and Folan, 6/19/06, MosleyWAV95D9, at 2:17-3:11).

47.     Mosley told Turner that the portfolio into which Sentinel was placing the income notes "was just really an off-shoot of our … other business" for hedge fund and FCM customers who wanted something "a little more aggressive."  Ex. 090 (call between Mosley, Turner, LeFreniere, and Folan, 1/11/07, MosleyWAV4F33, at 5:17-6:9).  When FTN asked for an investment policy or guidelines to confirm in writing what Mosley's representations, Sentinel sent FTN the "HSE Portfolio" guidelines.  Ex. 091 (e-mail from Mosley to Folan, 1/17/07, Grede v Folan - FTN-2604412).

48.     Under those guidelines, income notes were an allowable investment.  *Id.*  These guidelines stated the portfolio had been in existence since January 2002, that the objective of the portfolio was "[t]o provide a combination of income and capital growth while maintaining some measure of liquidity," that it sought "above average returns from a portfolio of securities that range from the commonly accepted definition of 'investment grade' to lower quality debt

securities of U.S. issuers," and that "asset backed securities," "collateralized debt obligations," and "private placements" were allowable investments. *Id.*

49.    The guidelines confirmed that the portfolio was officially authorized to invest in non-investment grade CDOs such as income notes and that only "some measure of liquidity" for the portfolio was required. *Id.*

50.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

51.    Mosley told Folan that he would have the guidelines authorized by Eric Bloom. Ex. 095 (call between Mosley and Folan, 1/16/07, MosleyWAV4F52, at 4:3-14) (Mosley: "Officially I gotta wait for Eric to get back …. I don't want to just … it is going to be official … so I need him to … sign off on it."  Folan:  "You can't just send it out, I understand completely.").

52.    Mosley sent the HSE Portfolio guidelines to Matt Keel, Sentinel's chief compliance officer, on January 17, 2007, ████████████████████████████. Ex. 097 (email from Mosley to Keel, 1/17/07, TQ0024454-55, attaching HSE investment Guidelines). ████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

53.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

54. 

55.     Sentinel's QIB letters were reviewed by the FTN employee responsible for obtaining such letters from PreTSL buyers, Gina Douglas, ███████████████████████ ███████████████████████████████████████████████████ ████████ Ex. 099 (Douglas Tr., 3/8/11, at 37:5-38:15, ███████). Douglas called Sentinel █ ████████████████████████████████████████████████████ *Id*. at 37:5-38:22, ███████. Logan of Sentinel explained to her that Sentinel was in fact purchasing PreTSLs for its own account and then allocating them to customer portfolios with internal journal entries. *Id*. at 37:5-39:13, 94:10-95:17.  Douglas also told Logan that the securities "ha[d] to go to an appropriate account," and she followed up this conversation with someone at FTN (her practice would have been to speak to Folan, the sales representative), who told her that Sentinel was "huge," that it managed money for "large institutional accounts," and that whoever the securities were allocated to would be appropriate. *Id*. at 41:13-14, 41:7-9, 41:16-20. There is no evidence that Douglas, who was a lower level, non-management FTN employee, *id*. at 23:18-24:5, expressed concern about Sentinel's QIB letters to either FTN management or de St. Phalle.

56.     Beginning in January 2007, Folan encouraged Mosley to purchase combo notes or to convert Sentinel's existing income note holdings into combo notes specifically because they could be repoed.  Ex. 195 (call between Mosley and Folan, 1/31/07, MosleyWAV4FDC, at 3:7-

4:12) (addressing an unspecified combo note and then discussing "repoability," with Mosley

asking FTN to help him with income notes).  In the months that followed, FTN assisted Sentinel

in exchanging its income note and/or certain rated PreTSL holdings for combo notes with

investment grade ratings.  By the end of February 2007, Sentinel had already purchased $20

million in combo notes from FTN.  Ex. 105 (e-mail from Jeff Logan to E. Bloom, 3/22/07,

TQ5915305).  The purpose of these transactions was to allow Sentinel to lend out the combo

notes under repurchase agreements with FIMAT for cash.  Ex. 196 (call between Mosley and

Folan, 3/7/07, MosleyWAV3C7B, at 5:13-20) (Mosley stating that his main concern is ensuring

that income notes are able to be repoed.); Ex. 197 (call between Mosley, Folan, and de St. Phalle,

2/1/07, MosleyWAV4694, at 8:14-9:11) (Folan: "The good thing for you is with this rating

you'll be able to get a good rating on your repos, right?" Mosley: "Yeah … [this] is going to help

us out.… This will be good.  And maybe, you know, we can start doing this with some of the

other stuff I have."); Ex. 198 (email from Logan to Bloom and Mosley, 4/4/07, at TQ5915598).

57.     In 2007, Sentinel engaged in repo financing transactions with FIMAT using the

combo notes created with the assistance of FTN.  Ex. 100 (Physical Trade Activity, 4/5/07, at

TRST04139407) (showing purchase from FTN and repo to FIMAT); Ex. 101 (e-mail from Scott

Skyrm to Logan, 4/5/07, at TQ6139341) (FIMAT agreeing to repo); Ex. 102 (call between

Skyrm and Logan, 4/5/07, LoganWAV3833, at 2:21-4:7) (FIMAT agreeing to repo).

58.  Eric Bloom and T.C. Arana were specifically notified of this transaction.  Ex. 104

(e-mail from Bloom to himself, 4/4/07, at TQ4294032); Ex. 073 (e-mail from Bloom to Mosley,

4/2/07, at TQ0877436); Ex. 199 (e-mail from Arana to Bloom, 4/2/07, at TQ0877439); Ex. 198 (e-

mail from Logan to Bloom and Mosley, 4/4/07, at TQ5915598).

59.     Eric Bloom knew well before the April 4, 2007 transaction that Mosley was selling the income notes back to FTN and then buying combo notes so that Sentinel could repo them out to secure cash, which constituted an economic benefit for Sentinel.  Ex. 105 (e-mail from Logan to Eric Bloom, 3/22/07, at TQ5915305) ("What [Mosley] is doing is selling the income notes back to Steve and in turn buying rated combo notes that we can lend to Fimat.  We have done about $20mm so far since Jan/Feb.  Steve and Charles are going to get the rest done starting next week…. Steve is going to get to work for us.  It sounds like they are going to do all of the income notes for us which should be another 20-25mm.").

60.     There is no evidence that either Folan or de St. Phalle understood in early 2006 that Sentinel required substantial liquidity from its income note holdings.  Sentinel made a request for liquidity to KBW at year-end 2005, while de St. Phalle was still employed there, but this did not raise concerns for him because it is common for customers to raise cash at year-end, and he had not been told that Sentinel was trying to sell its income note holdings as part of that cash-raising effort.  KBW turned down Sentinel's request, and there was apparently no ill effect on Sentinel.  Ex. 210 (de. St. Phalle Tr., 5/11/2011, at 305:16 - 19; 314:13-315:7).

61.     After Sentinel's year-end 2006 request for liquidity to FTN, de St. Phalle independently suggested to Mosley that Sentinel limit itself to small income note pieces that could be more easily traded, and combo notes, which Sentinel could repo.  Ex. 107 (call between de St. Phalle, Folan, and Mosley, 1/8/07, MosleyWAV4F1A, at 29:16-32:10).

**HomeBanc Securities**

62.     In March 2007, Defendants discussed with Mosley the possibility of Sentinel purchasing HomeBanc trust preferred securities owned by FTN.  In the taped phone conversation about HomeBanc quoted in paragraph 135 of the Third Amended Complaint, de St. Phalle

warned Mosley that the HomeBanc securities were unrated, described how HomeBanc's stock

price had fallen, discussed HomeBanc's plan to drop its REIT status (which made it ineligible to

be in a PreTSL pool), and described HomeBanc's mortgage holdings as "less than one percent …

in subprime." Ex. 175 (call between de. St. Phalle, Folan, and Mosley, 3/27/07,

MosleyWAV3CE5, at 7:21-8:11, 15:14-21).  In a subsequent phone conversation on March 30,

2007, FTN employee Dan Collins told Mosley how HomeBanc's plan to drop its REIT status

had been a "disaster" from an equity standpoint.  Collins also said, "[t]hey don't do subprime.

They do around 1% origination subprime, and then they sell it off. So this is not a subprime

REIT."  Ex. 176 (call between Mosley, de St. Phalle, Collins, and Mosley, 3/30/07,

MosleyWAV3D03, at 12:15-18).

      63.    The Form 10-K for HomeBanc, filed with the SEC on March 15, 2007 and sent to

Mosley by Folan on March 27, 2007, disclosed four categories of loan products originated by

HomeBanc: (1) "Prime First Mortgage Loans," which were "prime credit quality, first-lien

mortgage loans secured by one-to-four family residences" and which included an "Alt A ARM

product with reduced documentation to borrowers who satisfy [loan-to-value] ratio and loan

purpose criteria prescribed by the Fair Isaac Corporation (the 'FICO score')"; (2) "Prime Second

Mortgage Loans," which were "prime credit quality loans secured by second liens on one-to-four

family residences"; (3) "Prime Construction-to-Permanent Loans," which were included in one

of the preceding categories "[o]nce the construction phase is complete and the loan converts to a

permanent mortgage"; and (4) "Subprime Morgtage Loans," which were "first-lien mortgage

loans secured by one-to-four family residences to individuals with less than 'prime' credit, based

on a variety of factors including borrower FICO scores and the secondary mortgage loan market

purchasers' purchase and pricing criteria," and which ranged from 1.0 to 1.2% of HomeBanc's

mortgage originations in the preceding three years.  Ex. 177 (HomeBanc Form 10-K, Grede v

Folan-FTN-1920736-38; 1920783-1920872, at 1920814).  The HomeBanc Form 10-K also

described how the company used FICO scores to determine a borrower's credit and presented

tables showing the percentages of borrowers within each FICO score level, including for

borrowers whose loans HomeBanc held for investment.  (*Id.* at 1920815-1920816, 1920823).

The Form 10-K broke out HomeBanc's mortgage holdings in various other ways as well (Grede

v Folan-FTN-1920817-1920825), and included extensive disclosure of "Risk Factors" (Grede v

Folan-FTN-1920842-19208272), including the risk that HomeBanc's business would be

adversely affected if its credit lines and other sources of liquidity were disrupted (Grede v Folan-

FTN-1920845, FTN-1920863), the risk that HomeBanc's ARM products, which "comprised

substantially all of the mortgage loans that [HomeBanc] held in [its] investment portfolio,"

exposed HomeBanc to "greater credit risks than traditional mortgage loans" (Grede v Folan-

FTN-1920849), and the risk that changing economic conditions might adversely affect the

performance of HomeBanc's ARM loans (Grede v Folan-FTN-1920856-FTN-1920857).

### PreTSL Ratings

64.     There is no evidence that Mosley misunderstood PreTSL ratings.  Ex. 109

(Deposition of Charles Mosley, 2/9/11).

65.     Mosley and Sentinel received PreTSL offering circulars that explained the ratings

and their meanings.  The circulars stated that that the "ratings of Senior Notes address timely

payment of interest and the ultimate payment of principal," that the "ratings of the Mezzanine

Notes address the ultimate payment of interest and principal," and that the Income Notes will not

be rated."  Ex. 064 (PreTSL XXI Final Offering Circular, at 17).  Further, explanations of those

ratings were publicly available from the rating agencies. ████████████████████



; *see also* Exs. ████ 112

66.     Mosley and other Sentinel personnel had accounts at Moody's website, which gave them access to rating methodologies and definitions.  Ex. 113 (TQ0290933; TQ0009342; TQ0018810).  Mosley frequently received rating agency updates on the trust preferred CDO market, as well as rating information for specific PreTSL deals.  These reports described the rating agencies' approaches to rating trust preferred CDOs.  *See, e.g.*, Ex. 114 (e-mail from Doli Rodriquez attaching Fitch Ratings, Presale Report, Preferred Term Securities XX, Ltd./Inc. (Dec. 2005) at TQ0299014); Ex. 115 (e-mail from Bob Rogoz attaching Moody's Update on the US Trust Preferred CDO Sector (Aug. 2006) TQ0510796; Ex. 116 (e-mail from Steve Folan attaching Derivative Fitch, 2006 Trust Preferred CDO Performance Summary (Dec. 2006) at TQ0625297).

67.     The Fitch presale report for PreTSL XX, for example, stated, "The expected ratings on the class A-1 and A-2 notes address the timely receipt of scheduled interest payments and the ultimate receipt of principal as per the deal's governing documents.  The expected ratings on the class B, C, and D notes address the ultimate receipt of interest payments and the ultimate receipt of principal as per the deal's governing documents."  Ex. 201 (Fitch Ratings, Presale Report, Preferred Term Securities XX, Ltd./Inc. (Dec. 2005), at TQ0299016).

**Market for PreTSLs**

68.     There is no evidence that Defendants ever assured Mosley or Sentinel that FTN would "make a market" in PreTSLs.  In 2006 and 2007, FTN purchased a number of PreTSLs from Sentinel.  *See* Ex. 049 (All FTN Trades with Sentinel, Jan. 1, 2004-Dec. 31, 2007, Grede v Folan-FTN-0797871-893).  However, at various times in 2006 and 2007, FTN personnel refused to repurchase Sentinel's PreTSLs, told Mosley that it would only purchase Sentinel's PreTSLs if FTN could, or told Mosley or Logan that FTN would not have competitive bids for Sentinel's PreTSLs.  *See, e.g.*, Ex. 202 (call between Mosley and Folan, 3/21/06, MosleyWAVB112, at 2:14-18, 3:10-11) (Folan stating that FTN will not be a strong bid, because it has "no place to go" with the PreTSLs.  Folan then advises Mosley to have KBW work on them too); Ex. 203 (call between Mosley, de St. Phalle, Folan, and Jankowski, 5/4/06, MosleyWAVA15A, at 12:13-21) (Jankowski stating that FTN will leverage its capital to remove bonds from Sentinel's portfolio "if we can"); Ex. 117 (call between Mosley, Folan, and Jankowski, 6/26/07, MosleyWAV2F7, at 10:8-24, 19:24-21:9); ███████████████████████████

███████████████████████████████████████████████████████

███; Ex. 119 (call between Mosley, Turner, Folan, and LaFreniere, 1/11/07, MosleyWAV4F33, at 9:5-11) (Turner telling Mosley that FTN would not do repo transactions with Sentinel in the future); ████████████████████████████████████████████

███████████████████████████████████████████████████████

████████.

69.     The PreTSL offering circulars warned that "[t]here is no market for any of the Notes being offered hereby and, as a result, a purchaser must be prepared to hold the Notes for

an indefinite period of time or until the maturity thereof." *See, e.g.*, Ex. 064 (PreTSL XXI Final Offering Circular, at 20).

70.     Following the return of PreTSL combo notes by FIMAT in June 2007, FTN informed Mosley in a taped conversation on June 25, 2007 that it would take time to sell Sentinel's combo note position because "[i]t's not like they are trading all the time." Mosley did not demand that FTN immediately repurchase the combo notes. Mosley asked FTN to start "working to try and take it down," saying, "I understand how it works." Ex. 120 (call between Mosley, Folan, Howe, Duncan, de St. Phalle, and Jankowski, 6/25/07, MosleyWAV2E8, at 5:10-12, 17).

71.     At times, FTN encouraged Mosley to try selling Sentinel's PreTSLs to other brokers. On March 21, 2006, for example, Folan called Mosley to discuss his request that FTN purchase Sentinel's I-PreTSL 18 and I-PreTSL 19 notes. Folan said, "I'll be honest, we're not going to be a strong bid on this…because we have no place to go with those right now." Folan encouraged Mosley to try to sell those PreTSLs through KBW, because Jacques de St. Phalle thought KBW would have "somebody who might care a little more than we do right now." Ex. 121 (call between Mosley and Folan, 3/21/06, MosleyWAVB112, at 2:14-18, 3:10-15).

72.     On October 3, 2006, Folan and Logan had several conversations about FTN possibly purchasing PreTSL 9 income notes from Sentinel. Folan told Logan that FTN was willing to bid on the PreTSLs, but encouraged Logan not to sell those particular ones because FTN's bid would result in Sentinel losing money. Folan urged Logan to sell a different security on which Sentinel could make a profit instead. Later that day, FTN made a bid on the PreTSLs, but lost out to another broker. The following day, Folan had the conversation with Mosley quoted in paragraph 103 of the Third Amended Complaint, in which Folan apologized for the

miscommunication that gave the impression FTN had refused to make a bid. Ex. 122 (call

between Folan and Logan, 10/3/06, LoganWAV7455, at 2:19-3:2); Ex.123 (call between Folan

and Logan, 10/3/06, LoganWAV7456, at 2:15-4:2); Ex. 124 (call between Folan and Logan,

10/3/06, LoganWAV7457, at 2:8-4:20); Ex. 125 (call between Folan and Logan, 10/3/06,

LoganWAV746F, at 3:1-4:4); Ex. 126 (call between Folan and Logan, 10/3/06,

LoganWAV747A, at 3:15-17); Ex. 127 (call between Mosley and Folan, 10/14/06,

MosleyWAV6E40, at 7:6-9:7).

73.     On October 10, 2006, Folan warned Mosley that they needed to "forward plan"

for the next quarter if Sentinel wanted to sell PreTSLs to FTN, cautioning that if Sentinel waited

until the last week of the year, "[i]t makes it difficult for us to be able to take 'em down as much

as we'd like to." Ex. 128 (call between Folan and Mosley, 10/10/06, MosleyWAV6E6F, at 17:9-

10).

**Alleged Benefits Provided to Mosley**

74.     Sentinel's management team, including Eric Bloom, was aware that Folan and

other brokers frequently entertained Mosley, and, in some instances, joined him when he

socialized with brokers. *See, e.g.,*



; Ex. 130 (Deposition of Crysal York Tillett, 5/25/10, at 63-64, 93, 130, 183-184, 245);

; ; Ex. 133 (e-mail from Mosley to

Sentinel office, 2/14/2005, TQ0921071); Ex. 134 (e-mail from Mosley to Sentinel office,

3/21/05, TQ0056601); Ex. 135 (e-mail from Mosley to Sentinel office, 10/20/05, TQ5882570);

Ex. 136 (e-mail from Mosley to Sentinel office and emails between Mosley and E.Bloom,

11/10/05, TQ1500206, TQ0094155);  Ex. 137 (e-mail from Mosley sending an out of office

email that he is in Memphis at FTN, 10/5/06, TQ5882851); Ex. 138 (e-mail chain between

Mosley and Folan, TQ2916467, TQ0582720); Ex. 139 (e-mail chain between Eric Bloom and

Patty Lecompte, a JPMorgan employee, 4/5/05, TQ0847946); Ex. 141 (e-mail chain between

Mosley and Folan, 11/23/05, TQ6523962); Ex. 142 (e-mail chain between E. Bloom and

Gargano, 1/10/06, TQ0863123); Ex. 143 (call between Rudnick and Mosley, 5/11/06,

MosleyWAVA1A2, 5:9-14); Ex. 144 (e-mail chain between Mosley and Eric Bloom, 5/12/06,

TQ1674624); Ex. 145 (e-mail from Logan to Folan, TQ6367458).

75.     E-mail correspondence between and among Eric Bloom, Keel, and Mosley in late

2006 and early 2007 demonstrates that Sentinel's management team was also aware of Mosley's

accounting for PreTSL income notes and the effect on his bonus.  Ex. 213 (e-mail from Keel to E.

Bloom, 1/11/07, TQ0021877, TQ0021879-80); Ex. 146 (e-mail from E. Bloom to Mosley, 1/18/07,

at TQ0024456-58); Ex. 147 (e-mail from Mosley to E. Bloom, 1/22/07, at TRST 12912025-26);

Ex. 148 (e-mail from Keel to E. Bloom, 9/20/06, TRST05388818); Ex. 149 (e-mail from E. Bloom

to Mosley, 12/14/06, at TQ0047641); Ex. 150 (e-mail from Keel to E. Bloom, 11/21/06, at

TQ0021530-533); Ex. 151 (e-mail from E. Bloom to Mosley, 3/2/07, TQ0047812-17).

**Blue Sky Law Rescission Notice**

76.     FTN Financial Securities Corp. received a letter from Chris C. Gair, as

representative of the Trustee, on October 31, 2008, stating that "pursuant to the provision of

sections 13(A) and (B) of the Illinois Securities Law of 1953 (815 ILCS 5/13) ('the Illinois Blue

Sky Law'), the Trustee elects to rescind the sale to Sentinel" of certain securities purchased from

FTN.  Ex. 152 (Letter from Fair to FTN Financial Securities Corp. 10/31/08).  Apart from the

complaints filed in *Grede v. Folan*, Case No. 08CV6587, FTN Financial Securities Corp. and First

Tennessee Bank, N.A. have received no other notices of Sentinel's or the Trustee's election to

rescind securities transactions.

### Sentinel's Objective in Purchasing PreTSLs

77.     There is no evidence that Mosley's intent in purchasing PreTSLs and other

securities from Defendants was to hinder, delay, or defraud Sentinel's creditors.  Mosley's intent

was to manage Sentinel's portfolios profitably in order to enhance his own compensation. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████.  In an email exchange between Mosley and Eric Bloom in January 2007,

Mosley stated:

> Regarding the investments in the house, all of those investments are made with
> the firm's best interest in mind….  How we put these [physical securities] on our
> books allows us to earn a good return and give us better flexibility to get out of
> these when necessary.  If I can not [sic] put these on the books based on what I
> think is correct. [sic]  I will not trade these products….  To me the portfolio
> manager is the most important position for a money manager.  As long as the
> portfolio performs well we are able to keep existing clients and it allows the sales
> force to bring in new clients.  In the case of horizon, we have seen that a bad
> portfolio manager can drive existing clients away.  And that no matter who your
> sales person is you can't bring in new accounts.  Given those facts, it is hard to
> understand why anyone else would have a base above the portfolio manager.

Ex. 147 (e-mail between Mosley and E. Bloom, TRST12912025).  In that same exchange, Bloom

assured Mosley, "We did well so you should do well too."  *Id.*

Dated: July 14, 2011[3]                    Respectfully submitted,


                                            /s/ Michael B. Slade

                                            Brian D. Sieve, P.C. (ARDC #6199741)
                                            Michael B. Slade (ARDC #6274231)
                                            KIRKLAND & ELLIS LLP
                                            300 N. LaSalle Street
                                            Chicago, Illinois  60654
                                            Telephone: (312) 862-2000
                                            Facsimile: (312) 862-2200


                                            Howard M. Shapiro
                                            Patrick J. Carome
                                            John A. Valentine
                                            Jeannie S. Rhee
                                            WILMER CUTLER PICKERING HALE
                                               AND DORR LLP
                                            1875 Pennsylvania Avenue, N.W.
                                            Washington, DC  20006
                                            Telephone: (202) 663-6000
                                            Facsimile: (202) 663-6363


                                            Mark D. Griffin
                                            Lori H. Patterson
                                            Kristine L. Robert
                                            BAKER, DONELSON, BEARMAN, CALDWELL &
                                               BERKOWITZ, PC
                                            First Tennessee Building
                                            165 Madison Avenue, Suite 2000
                                            Memphis, Tennessee  38103
                                            Telephone:  (901) 526-2000
                                            Facsimile:  (901) 577-0870


                                            *Attorneys for Defendants Stephen M. Folan, Jacques
                                            de St. Phalle, and FTN Financial Securities Corp.,
                                            and First Tennessee Bank, N.A.*

---

[3] This Statement of Undisputed Material Facts was originally served on Plaintiff on June 27, 2011.  A corrected version was also served on June 28, 2011.  This supplemental and amended version was served on Plaintiff on July 14, 2011.

William Gibbs Sullivan
Royal B. Martin
Mason N. Floyd
MARTIN, BROWN, SULLIVAN, ROADMAN
& HARTNETT, LTD
135 S. LaSalle St., Ste. 3200
Chicago, IL 60603
Phone: (312) 360-5000


***Attorneys for Stephen M. Folan and Jacques de St. Phalle***

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2011, a true and correct copy of the foregoing was sent by hand-delivery and electronic mail to:

Chris C. Gair, Esq.
James Kevin McCall, Esq.
Jeffrey S. Eberhard, Esq.
Gregory M. Boyle, Esq.
Anne Paffrath Ray, Esq.
Kevin Case, Esq.
Vincent E. Lazar, Esq.
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
***Attorneys for the Liquidation Trustee***

/s/ Michael B. Slade
Michael B. Slade (ARDC #6274231)
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Facsimile: (312) 862-2200